## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE  DIVISION

LINDA GOODWIN                                    Civil Action No. 6:16-cv-0009

versus                                                    Unassigned District Judge

ACADIAN AMBULANCE                    Magistrate Judge Carol B. Whitehurst
SERV., INC.

## REPORT AND RECOMMENDATION

Pending before the undersigned on referral from the district judge is the Motion

for Summary Judgment [Doc. 35] filed by defendant Acadian Ambulance Services,

Inc. ("Acadian Ambulance"), in which Acadian Ambulance seeks dismissal of the

plaintiff's claims of age discrimination and harassment on grounds there are no

existing genuine issues of material fact, and Acadian Ambulance is entitled to

judgment as a matter of law.  *Pro se* plaintiff Linda Goodwin opposes the motion

[Doc. 39].  For the following reasons, the undersigned will recommend that the

motion for summary judgment be GRANTED.

### *I. Background*

The instant lawsuit alleges claims for age discrimination and harassment based

on age under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), *et seq.*

("Title  VII"), arising out of an employment relationship between the plaintiff,

employed by Acadian Ambulance as a Verifier, and the defendant corporation, Acadian Ambulance.  The following facts are undisputed:

- Acadian Ambulance is an ambulance service provider.  Plaintiff, born June 3, 1954, began working at Acadian Ambulance's Lafayette, Louisiana facility as a Verifier on July 5, 2006.  Plaintiff's job duties as a Verifier include handling automobile accidents, verifying patient demographics, and checking insurance and payment responsibilities.

- On January 21, 2009, plaintiff's supervisor, Debra S. Martin ("Martin"), completed a Performance Appraisal, in which she observed that Goodwin "[o]ccasionally expresses a resentful attitude and has difficulty maintaining a pleasant demeanor."  Martin also noted that Goodwin had missed four days for being ill, and that she needed to call a manager when issues arose. Goodwin signed this evaluation.

- On Goodwin's February 14, 2013 evaluation, her supervisor, Dana Simon ("Simon"), noted that Goodwin "needs to watch her tone with employees," because "she sometimes comes across a little aggressive." Simon also wrote that Goodwin "[n]eeds to work on having more of a positive attitude in the workplace." Goodwin signed this evaluation.

- On March 31, 2013, Shawn Wheatley, Refund Specialist, notified Simon that a patient's mother had called and was "very upset" that Goodwin had called her residence and hung up on her. The caller stated that "with the attitude [Goodwin] has she needs to be fired." The employee tried to get information from the caller, who responded, "I do not have time to play 'your monkey around games.' I will have my Attorney call you people."

- As a result of Goodwin's misconduct, Simon issued an Employee Counseling Notice on May 2, 2013.  In it, Simon wrote: "Per ACS [Acadian Client Services] policy we will extend excellent customer service anything less than that is unacceptable." She warned Goodwin that: "Any additional occurrences will lead to further counseling up to and including termination." Goodwin refused to sign this Notice.

- On May 2, 2013, Simon counseled Goodwin on attendance and punctuality. In the Employee Counseling Notice, Simon noted that Goodwin had received a verbal notice on January 15, 2013, for tardiness/absenteeism, and was informed that "any infractions would result in written warning." Afterwards, Goodwin called in sick on February 27, 2013, and left early on April 15, 2013 and May 1, 2013. Because of Goodwin's repeated actions, Simon wrote: "As per the ACS attendance policy, 4 occurrences in a 6 month rolling time frame will constitute written warning. Any additional occurrences will lead to further counseling up to and including termination." Goodwin refused to sign this Notice.

- In July, 2014, Goodwin filed a Grievance with Acadian Ambulance, claiming that someone put something in her food at the ACS Department Crawfish Boil held on the first Saturday of June 2014. She also alleged that another employee had videoed the incident and uploaded the video to Instagram.

- Per Goodwin's request, Joe Lightfoot ("Lightfoot"), Vice President of Human Resources for Acadian Ambulance, held a meeting with her on July 11, 2014. Goodwin claimed that an Acadian Ambulance employee, Sheraka Knight ("Knight"), had put "drugs" in her food that "made [Goodwin] forget" and become "confused." Goodwin told Lightfoot that the incident had been recorded on a video, and that her immediate supervisor, Martha Dugas, ACS Supervisor ("Dugas"), Diane Groh, Director of Revenue Cycle ("Groh"), and others "just watched and laughed." Goodwin claimed she sought medical treatment for "large nodules" on her thyroid gland, for which she had surgery.

- At Goodwin's request, Asbel Montes ("Montes"), Vice President of Acadian Client Services, Ronnie Miller ("Miller"), Director of Acadian Client Services ("Miller"), and Claire Wells ("Wells"), Administrative Assistant, met with her on August 14, 2014, regarding her complaint that someone put something in her food at the Acadian Ambulance spring social. During the meeting, Montes asked Goodwin what had happened, and Goodwin began to get "very upset and breathing heavily." She stood up, and began speaking in a "very high and

disrespectful tone." Then, she opened the door, continued to yell at Montes, and pointed a finger in his face in the presence of Cherie Simon, Job Facility Billing Manager, Acadian Client Services ("C. Simon"), and Carrie Landry, who were sitting in cubicles immediately outside of Montes' office door. Simon confirmed the incident in an email to Wells.

- On August 15, 2014, Montes, Miller and Wells held a meeting with Knight in Montes' office regarding the crawfish boil incident. Until that time, Knight had been unaware of Goodwin's grievance about the crawfish boil. Knight said that Goodwin had "always had an attitude (grouchy, mean)" and was "not a team player." Knight reported that she had had an argument with Goodwin on July 7, 2014, about vacation time, and that Goodwin was "furious and even attempted to confront [Knight] in an aggressive manner," Knight said that since that day, Goodwin had been "disrespectful and hateful" towards her. At that meeting, Knight denied putting anything in Goodwin's food. She was unaware of a video depicting the alleged incident.

- On September 9, 2014, Montes sent a Memorandum to Goodwin entitled "Update to Grievance." In the Memo, Montes stated that "[a]fter reviewing and investigating the grievance filed with Joe Lightfoot . . it is concluded that none of the individuals [Tiffany Cooper, Knight, Dugas and Groh] referenced in the grievance were able to recollect the incident that is alleged to have occurred or have any intimate knowledge of a video that was posted to social media regarding the incident." Goodwin was advised that if she wished to pursue this matter further, she could submit a brief written statement of her grievance to John Zuschlag ("Zuschlag"), Executive Vice President, for review per the Employee Grievances and Problem Resolution Policy. Goodwin never contacted Zusehlag.

- On September 10, 2014, Goodwin sent an email to Lightfoot regarding the grievance resolution and response, stating "[i]t is odd that they cannot recall this incident when asked by Asbel Moines, but they talk about it constantly at work on a daily basis." She also wrote that, "Whey really think they have gotten away with this, but 1 am not about to allow something like this be swept under the rug."

4

- On October 29, 2014, Goodwin's supervisor, Natalie Roberts ("Roberts"), issued an Employee Counseling/Discipline Notice to Goodwin. In that Notice, Roberts reported that Goodwin and Brittney Dauterive ("Dauterive"), a Verifier, had been involved in a verbal altercation. Roberts brought both of them into her office with Lonnie Hotard ("Hotard"), ACS Supervisor, and Dugas present. Roberts explained to Goodwin and Dauterive that their "attitude and disrespect will not be tolerated." Roberts also stated that they were "expected to conduct themselves in a professional manner," and that "[a]ny issue should be taken into the office for discussion and not be handled in an open" area. Goodwin was cited for Reckless Behavior, and issued a one-day disciplinary suspension from employment without pay. Roberts further stated that the "[n]ext occurrence or outburst will result in termination of employment."

- On November 13, 2014, Lightfoot met with Regina Hall ("Hall"), a Verifier, and Allyson Pharr ("Pharr"), Acadian's General Counsel. Hall said she saw Goodwin at the crawfish boil but did not talk to her. She reported that after that day, Goodwin never inquired about something being put in her food. Hall never saw or heard anyone talk about a video of the incident.

- On November 13, 2014, Lightfoot and Pharr interviewed Donnelle Cormier, Verifier ("Connier"). Cormier said that Goodwin "isn't pleasant at all." She stated that she was unaware of any video from the crawfish boi1. She reported that Knight had told her recently that Goodwin thought that someone had put something in her food.` Cormier said that she and her co-workers had stopped talking to Knight as well as Goodwin."

- On November 13, 2014, Lightfoot and Pharr interviewed Dauterive. Dauterive did not attend the crawfish boil. She had never heard of any video, and never told anyone that there was a video online." She also did not tell Goodwin that someone was trying to poison her.

- On November 13, 2014, Lightfoot met with Dora Cluse ("Cluse") and Pharr. Cluse, who was born April 15, 1959 and is 58 years old, said that she did not see anybody put anything in the food at the crawfish boi1.

She said that Goodwin "had some issues going on in her head. I can't deal with her. . . . Her attitude has changed totally." She had never seen or heard of a video taken at the crawfish boil. She also said that Goodwin was "getting on the paranoid side."

- On November 14, 2014, Cluse sent an email to Lightfoot, in which she complained that the "tension and lack of respect" due to Goodwin's behavior had become "beyond bearable." She said that Goodwin "always has an attitude," and that she never knew "when [Goodwin] is just going to blow up and cause harm." Cluse also stated that she and her co-workers should "not have to deal with so much negativity," and that she had "never had to deal with so much disrespect from a co-worker." Finally, Cluse said that she was "very uncomfortable sitting next to [Goodwin]," and requested that Goodwin "be removed from around our area."

- Afterwards, Goodwin requested to be moved away from her co-workers because of the noise from them. Acadian Ambulance agreed to her request, and moved her to another location.

- On December 19, 2014, Lightfoot and Pharr met with Goodwin. Lightfoot and Pharr told Goodwin that Acadian Ambulance could not substantiate her claim. Goodwin continued to blame Cluse for planning the poisoning incident. Lightfoot asked Goodwin whether it had been better after she had moved her workstation away from her co-workers, to which Goodwin responded, "It's better because I'm not in it."

- On December 22, 2014, Roberts emailed Lightfoot, Montes, and Miller, stating that Goodwin had called in sick. Roberts said that Goodwin's last occurrence had been on November 20, 2014, and resulted in a write-up. Goodwin claimed that it should have been covered under her FMLA. Roberts said that FMLA Sources, Acadian's third-party FMLA administrator, had denied Goodwin's intermittent leave because she had not submitted her documentation. Up until that date, Roberts had not been kept informed of the situation. She stated that this would have been Goodwin's fifth occurrence, which would be grounds for termination.

- Additionally, Goodwin had claimed eight hours of overtime. Roberts

6

reminded Goodwin that she had to limit her overtime to only four times a week; however, she had claimed over nine hours of overtime on her timesheet for that pay period. Because Goodwin had disregarded the overtime rules, Roberts issued a write-up.

- On January 7, 2015, Goodwin sent Lightfoot an email regarding her complaints about Cluse. Two days later, on January 9, 2015, Goodwin came into Robert's office, complaining that she was "tired of everything that is going on in here." When Roberts asked Goodwin to specify her complaints, she simply replied, "everything." She said that she was tired of all the talking and that she did not understand what she had done to Cluse. Roberts asked her again what was being said, to which Goodwin responded, "the same thing." Goodwin could not tell Roberts specifically what was being said or what she was tired of. Goodwin did mention that Cluse had scanned a copy of Goodwin's ID badge and had it on Cluse's computer. She was unable to tell Roberts how or why Cluse would have access to her badge.

- On January 26, 2015, Acadian Ambulance received a Notice of Charge of Discrimination ("Charge") from the EEOC. In that Charge, Goodwin alleged discrimination based on race and age, as well as retaliation.

- On March 6, 2015, Dugas wrote a Performance Appraisal on Goodwin. In that evaluation, Dugas noted that Goodwin needed "improvement in being a team player — asking for additional work to assist other employees." She also wrote that Goodwin needed "improvement in attitude and having a positive outlook." Goodwin refused to sign this evaluation.

- On April 10, 2015, Roberts, Montes, Miller, and Lightfoot met with Goodwin as a follow-up to her complaints. They reviewed all the steps of the process in which they had participated since July 2014. Lightfoot explained that Acadian Ambulance was unable to substantiate Goodwin's complaints that; (1) someone had put something in her food at the crawfish boil; (2) there was a video of the incident that was shared on social media, and (3) anyone tampered with anything else (coffee, etc.) at any other time.

- At that meeting, Acadian Ambulance's supervisors also reviewed Goodwin's workstation situation. Goodwin had previously agreed to be moved across the room so that she was not in the middle of the cubicles of the employees whom she felt were talking about her and/or responsible for putting something in her food. She agreed that this had helped the situation.

- Goodwin's supervisors offered to move her to another building if she wanted to, in an effort to provide what she might perceive as a safer work environment. Montes was clear that this was strictly Goodwin's decision, and did not want it to be seen as punishment, but rather as an option that she could choose if she felt it would make the situation better. Goodwin told Roberts, Montes, Miller and Lightfoot that she would like to try that, Ultimately, Goodwin requested to move her workstation away from her co-workers. Acadian Ambulance accommodated her request by relocating Goodwin to another Lafayette building on Kaliste Saloom Road. Goodwin agreed that the situation had been better since she had moved away from the other employees.

- On August 4, 2015, Roberts sent an email to Montes and Lightfoot regarding another incident involving Goodwin. Goodwin had complained that she was not happy about using the new VDI system, which had been approved for her because her computer was running slow using the previous login system. The IT department had called the previous day to help her out with an issue, and determined that she was not using the new VDT system but, instead, logging into the system the old way. Dugas, who was born October 7, 1970 and is 46 years old, removed Goodwin's access.

- Roberts was approached by Lauren Starling ("Starling"), ACS Supervisor, on the morning of August 4, 2015, because Starling had heard Goodwin being "loud, rude and very disrespectful" to Dugas. Goodwin was mad that Dugas had her access removed. This was an IT decision and Dugas had not been given the opportunity to tell Goodwin that or to even check into the situation. Roberts pulled Goodwin into Miller's office, with Miller present, to find out what had happened. Goodwin did not dispute that she was rude and actually had an attitude with Roberts. Miller handled the remainder of the conversation and

explained that "this type of behavior will not be tolerated."

- Roberts reported that she had expressed her concerns with Goodwin's behavior before. She also stated this was extreme and should not be tolerated. She further wrote that it had "gotten to the point where I was very uncomfortable with this whole situation."

- On August 12, 2015, Roberts issued an Employee Counseling/Discipline Notice ("Notice") to Goodwin regarding the incident in which Goodwin had yelled and was rude to Dugas. In that Notice, Roberts stated that: "This behavior is not tolerated and will not continue to happen," Under Action to be taken, Roberts wrote that "Any further issues will result in further disciplinary actions up to and including termination."

- On September 3, 2015, the EEOC issued a Dismissal and Notice of Right to Sue, finding that: "Based on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."

- On October 13, 2015, Roberts issued an Employee Counseling/Discipline Notice ("Notice") to Goodwin on the grounds of tardiness/absenteeism. Roberts wrote in the Notice that Goodwin had incurred her second incident of tardiness when she reported to work 25 minutes late for her shift which began at 7:00 a.m. Roberts noted that due to the sensitive nature of operations, it was imperative for Goodwin to arrive at work on time. In the section of the Notice regarding "Action to be taken," Roberts stated that Goodwin had to report to work on time and be prepared for her shift at the scheduled time. Roberts further indicated that "future policy violations would result in a one-day suspension without pay."

- Acadian never demoted or terminated Goodwin from its employment.

Plaintiff filed suit against Acadian Ambulance on December 3, 2015, in the Fifteenth Judicial District Court for the Parish of Lafayette, Louisiana, alleging harassment and age discrimination under Title VII. Acadian Ambulance removed the

9

action to this Court on January 5, 2016. On June 7, 2017, Acadian Ambulance filed the instant motion for summary judgment, seeking summary dismissal of the plaintiff's claims on grounds there are no genuine issues of material fact in dispute, and Acadian Ambulance is entitled to judgment as a matter of law.

## II. Summary Judgment Standard

Summary judgment is appropriate where the facts and law as represented in the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Proc. 56(c). A fact is material if it could affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 47 U.S. 317, 325 (1986). Only after a proper motion for summary judgment is made must the non-movant set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

As the Fifth Circuit has pointed out:

This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts*. ...[S]ummary judgment is appropriate in *any* case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations omitted)(emphasis in original).

In evaluating the evidence provided in support of, and in opposition to, a Motion for Summary Judgment, "[t]he court must view facts and inferences in the light most favorable to the party opposing the motion." *Hunt v. Rapides Healthcare Sys. LLC*, 277 F.3d 757, 762 (5th Cir. 2001). "A factual dispute precludes a grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the non-moving party." *Id*. In evaluating evidence to determine whether a factual dispute exists, "[c]redibility determinations are not part of the summary judgment analysis." *Id*. To the contrary, "[i]n reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the non-moving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

### III. Applicable Law

Before this Court can determine whether plaintiff's claims are subject to summary dismissal, it is necessary to determine the law governing the claims, which have been alleged by a *pro se* claimant. In her state court petition, which has not been amended since the case was removed to this Court, the plaintiff alleges her cause of action is brought pursuant to "Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.CA. §2000e et seq."[1] The plaintiff goes on to allege the following:

9.   The facts previously set out give rise to an action for discrimination as set forth in Title VII. According to Title VII, it is unlawful for an employer to discriminate against an employee on the basis of age, or to otherwise create a hostile work environment.[2]

10.   Defendant[], Acadian Ambulance Service, Inc., discriminated against Plaintiff by creating and alleging a hostile work environment because of Plaintiff's age.[3]

In its motion, the defendant seeks summary dismissal of plaintiff's "claims for harassment based upon Title VII . . . and age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA")."[4]

-----

[1] *See* plaintiff's state court petition, Doc. 1, at ¶4.

[2] *Id.* at ¶9 (emphasis added).

[3] *Id.* at ¶10 (emphasis added).

[4] *See* memorandum in support of Acadian Ambulance's motion for summary judgment, Doc. 35, at p.1.

Notwithstanding the allegations contained in the plaintiff's petition and the defendant's framing of the issues, Title VII, by its own terms, applies only to employment discrimination on the basis of an employee's "race, color, religion, sex, or national origin." *See, e.g., Barkley v. Carraux*, 533 F.Supp. 242, 244 (S. D. Tex. Feb. 10, 1982) (because plaintiff did not allege employment discrimination on the basis of "race, color, religion, sex, or national origin," his complaint failed to state a claim under Title VII). In seeking dismissal of the plaintiff's claims, the defendant cites to jurisprudence addressing both Title VII and the ADEA in its analysis of the plaintiff's claims. However, because the plaintiff has not alleged employment discrimination on the basis of "race, color, religion, sex, or national origin," Title VII does not govern her claims, and, therefore, the undersigned finds her complaint fails to state a claim under Title VII.

As a general rule, a district court may dismiss a complaint on its own for failure to state a claim. *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2006), *citing Shawnee Intern., N.V. v. Hondo Drilling Co.*, 742 F.2d 234, 236 (5th Cir.1984). The Fifth Circuit has previously noted, however, a district court can only dismiss an action on its own motion "'as long as the procedure employed is fair.'" *Carroll*, 470 F.3d at 1177, *citing Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir.1998). The Fifth Circuit has suggested that fairness in this context requires "both notice of the court's

intention and an opportunity to respond." *Bazrowx*, 136 F.3d at 1054. This Court is also mindful that a *pro se* complaint is to be construed liberally with all well-pleaded allegations taken as true. *Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993), *citing Brinkmann v. Johnston*, 793 F.2d 111, 112 (5th Cir.1986). *See also Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (a document filed pro se is "to be liberally construed," *Estelle*, 429 U.S., at 106, 97 S.Ct. 285, and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers . . ").

Considering that the plaintiff has invoked the wrong statute as the basis for her claims, but further considering her *pro se* status and the requirement that the court consider her pleadings liberally, the undersigned finds that, to the extent the plaintiff couches her claims under of Title VII, such claims should be dismissed for failure to state a claim, but that the plaintiff's claims should be considered as arising under the ADEA and should be considered under that body of law. Consequently, the undersigned RECOMMENDS that, to the extent the plaintiff alleges claims under Title VII, such claims be DENIED AND DISMISSED WITH PREJUDICE for failure to state a claim, and that all claims be considered under the ADEA. The plaintiff is hereby put on notice of the potential dismissal of her claims under Title VII, but will have an opportunity to respond by way of being permitted to file objections to the

instant Report and Recommendation.

## IV. Analysis of Claims

### A. Plaintiff's Age Discrimination Claim

The plaintiff alleges she was discriminated against on the basis of her age. The ADEA prohibits employment discrimination in both the private and local government sectors, and in federal employment. *See* 29 U.S.C. §623(a) (private and local government sectors, or "nonfederal sectors"). Under the relevant provision pertaining to nonfederal sectors, "[i]t shall be unlawful for an employer to fail or refuse to hire ... any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a)(1).

Plaintiff's age discrimination claim is not based on direct evidence, but on circumstantial evidence. Historically, the Fifth Circuit analyzed ADEA claims based on circumstantial evidence using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Berquist v. Washington Mutual Bank*, 500 F.3d 344, 349 (5th Cir.2007), *cert. denied*, 552 U.S. 1166, 128 S.Ct. 1124, 169 L.Ed.2d 950 (2008). In *Gross v. FBL Financial Serv., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 2349 n. 2, 174 L.Ed.2d 119 (2009), the Supreme Court observed that it "has not definitively

decided whether the evidentiary framework of McDonnell Douglas utilized in Title VII cases is appropriate in the ADEA context." Nevertheless, the Fifth Circuit has continued to use the *McDonnell Douglas* framework post-*Gross* when deciding ADEA claims based on circumstantial evidence. *See, e.g., Jackson v. Cal–Western Packaging Corp.*, 602 F.3d 374, 378 n. 15 (5th Cir.2010) (recognizing that the Fifth Circuit has a history of applying the *McDonnell Douglas* framework to allocate the burden of production and the order of presenting proof in ADEA cases).

Under the *McDonnell Douglas* framework, "[a] plaintiff relying on circumstantial evidence must put forth a prima facie case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir.2010), *quoting Berquist v. Washington Mutual Bank*, 500 F.3d 344, 349 (5th Cir. 2007), *cert. denied*, 552 U.S. 1166, 128 S.Ct. 1124, 169 L.Ed.2d 950 (2008). To establish a *prima facie* case of discriminatory treatment based on age, a plaintiff is required to prove: (1) they are within the protected class; (2) they are qualified for the position; (3) they suffered an adverse employment decision; and (4) they were replaced by someone younger or treated less favorably than similarly situated younger employees (i.e., suffered from disparate treatment because of membership in the protected class). *Smith v. City of Jackson, Miss.*, 351 F.3d 183, 196 (5th Cir.2003)

(citations omitted). Under the statute, the protected class includes individuals who are at least forty years old. *See* 29 U.S.C. §§631(a), 633a(a).

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to proffer a legitimate nondiscriminatory reason for its employment action. *Machinchick v. PB Bower, Inc.*, 398 F.3d 345, 351 (5th Cir. 2005), *citing West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 (5th Cir.2003) (noting that once the plaintiff in an ADEA case has established a *prima facie* case of age discrimination, the defendant must "produce evidence of a legitimate, nondiscriminatory reason for its decision to terminate [the plaintiff's] employment"). If the defendant meets its burden, the presumption of discrimination created by the plaintiff's *prima facie* case disappears and the plaintiff must meet its ultimate burden of persuasion on the issue of intentional discrimination. *Machinchick*, 398 F.3d at 351, *citing Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896–97 (5th Cir. 2002); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222–23 (5th Cir. 2000). A plaintiff may meet this burden by producing evidence tending to show that the reason offered by the defendant is pretext for discrimination. *Machinchick*, 398 F.3d at 351, *citing Sandstad*, 309 F.3d at 896-97; *Wallace*, 271 F.3d at 219; *Russell*, 235 F.3d at 222-23.

In the instant case, the plaintiff cannot meet her burden of establishing a *prima*

*facie* case because she cannot satisfy the third element of the *McDonald Douglas* framework, that is, the plaintiff cannot demonstrate that she suffered an adverse employment decision. In the Fifth Circuit, an adverse employment action is an "ultimate employment decision," such as "hiring, granting leave, discharging, promoting, or compensating." *See, e.g., McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir.2007). The Fifth Circuit specifically does not include "events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything which might jeopardize employment in the future" in its definition of "ultimate employment actions." *See, e.g., Messer v. Meno*, 130 F.3d 130, 140 (5th Cir. 1997), *citing Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707–08 (5th Cir.1997). In *Cassimere v. Fastorq*, LLC, 2017 WL 812468, at *9 (W.D. La. March 1, 2017), the court noted:

> Title VII[5] does not cover "every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003). Allegations of unpleasant work meetings and verbal reprimands do not constitute actionable adverse employment actions. *King v. Louisiana*, 294 Fed.Appx. 77, 85 (5th Cir. 2008), *citing Burlington Northern*, 548 U.S. at 68); *see also Liddell v. Northrop Gumman Shipbuilding, Inc.*, 836 F. Supp. 2d 443, 457 (S.D. Miss. 2011) (disciplinary slip placed in personnel file that did not result in any type of reduced wages, terminations, or layoffs, or any other ultimate

---

[5] The undesigned finds the cases defining "adverse employment decisions" under Title VII are instructive in ADEA cases, and was unable to find any cases defining the terms differently under the two schemes.

employment action are not actionable under Title VII).

The record in this matter shows the plaintiff has received numerous warnings and write-ups for conduct that Acadian Ambulance argues justifies grounds for termination, however, the plaintiff continues to work for the company. Indeed, the record does not show, and the plaintiff does not argue, that the warnings and write-ups the plaintiff has received are anything other than routine disciplinary actions taken by Acadian Ambulance. In short, the actions taken by Acadian Ambulance do not amount to "ultimate employment decisions," such as "hiring, granting leave, discharging, promoting, or compensating." *See, e.g., McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir.2007). Thus, based upon established jurisprudence, the undersigned concludes the actions taken by Acadian Ambulance cannot be considered "adverse employment actions" for purposes of the ADEA.

To the extent the plaintiff might be arguing that her one-day suspension without pay constitutes an adverse employment decision, the undersigned finds such argument is without merit. In *Carroll v. City of Dallas, Texas*, 2005 WL 3543347 (N.D.Tex. 12/28/05), the court granted summary judgment in favor of the defendant, which sought dismissal of the plaintiff's Title VII race discrimination claim on grounds the plaintiff failed to show evidence of an adverse employment action. Plaintiff's submission argued he had received a two-day suspension without pay. The

court explained:

.....The upshot of the investigation was a two-day suspension without pay, and the issue before the court is whether that penalty-regardless whether it was fair or discriminatory-rises to the level of an ultimate employment decision.

Other courts have answered a similar question in the negative. Under the same standard used here in the Fifth Circuit, the Eleventh Circuit looked at the actual loss of income to the plaintiff for a one-day suspension without pay, and found it to be a one-time de minimis amount and therefore not actionable. *See Embry v. Callahan Eye Foundation Hosp.*, 147 Fed. Appx. 819, 829 (11th Cir.2005). The district court for the Southern District of Texas found a three-day suspension plus a plaintiff's being "written up" on several occasions and docked one day of leave not to amount to an adverse employment action, even in sum. *See United States v. Matagorda County, Texas*, 181 F.Supp.2d 673, 681 (S.D.Tex.2002). Here in the Northern District, then-Chief Judge Jerry Buchmeyer held that a three-day suspension is not an ultimate employment decision, though it is unclear from the facts of the case whether the suspension was with or without pay. *See McGarity v. Mary Kay Cosmetics*, 1998 WL 50460, *5 (N.D.Tex.1998). Although the Fifth Circuit has not decided the precise issue, it has questioned in dicta in a Title VII retaliation case whether even a 30-day suspension would rise to the level required to find an adverse employment action to exist in a case, like this one, in which the employee was not ultimately terminated. *See Zaffuto v. City of Hammond*, 308 F.3d 485, 493 (5th Cir.2002).

Here it is undisputed that [p]laintiff's rate of compensation, benefit package, and pension were not affected by the two-day suspension. Measured against the whole of his six-year employment with the City of Dallas, the economic impact is slight. In agreement with the reasoning of the decisions cited above, the Court finds that Plaintiff's two-day suspension without pay is characterized more accurately as a discrete, interim disciplinary measure rather than as an ultimate employment decision. Accordingly, it cannot support his Title VII cause of action for disparate treatment.

*Carroll*, 2005 WL 3543347 at *4 (emphasis added).

This Court finds the *Corley* case instructive. Indeed, in the instant case, it is undisputed that the plaintiff's rate of compensation, benefit package, and pension were not affected by the one-day suspension. Thus, like the court in *Corley* and the cases cited therein, the undersigned finds that plaintiff's one-day suspension without pay is characterized more accurately as a discrete, interim disciplinary measure rather than as an ultimate employment decision.

Considering the foregoing, the undersigned concludes the plaintiff cannot satisfy all of the elements of a *prima facie* case for age discrimination, and therefore, IT IS RECOMMENDED that the plaintiff's age discrimination claim be DENIED AND DISMISSED WITH PREJUDICE.

## B.     Plaintiff's Hostile Work Environment Claim

The plaintiff also alleges she was subjected to a hostile work environment. A hostile-work environment, sufficient to give rise to an action under the ADEA, exists when the harassment is sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment. *Kennedy v. Parkview Baptist School, Inc.*, 2014 WL 7366256 at *8 (M. D. La. Dec. 24, 2014), *aff'd*, 618 F. App'x 233 (5th Cir. 2015), *citing Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235–36 (5th Cir.2001), *quoting McConathy v. Dr. Pepper/Seven Up Corp.*, 131

F.3d 558, 563 (5th Cir.1998); *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 440 (5th Cir.2011). A claim for age-based harassment is modeled after similar claims under Title VII. *Kennedy*, 2014 WL 7366256 at *8, *citing Flowers*, 247 F.3d at 235–36; *Dediol*, 655 F.3d at 440. To succeed on this claim, a plaintiff must demonstrate: (1) that she belongs to a protected group under the ADEA (that is, over the age of 40); (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her age and/or disability; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) defendant knew or should have known of the harassment and failed to take prompt remedial action. *Kennedy*, 2014 WL 7366256 at *8, *citing Gowesky v. Singing River Hosp. Systems*, 321 F.3d 503, 509 (5th Cir.2003); *Dediol*, 655 F.3d at 441.

For harassment to affect a term, condition, or privilege of employment, it must be both objectively and subjectively abusive, that is,"one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Aryain v. Wal–Mart Stores Texas LP*, 534 F.3d 473, 479 (5th Cir.2008), *citing Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275 (1998). Whether a working environment is objectively hostile or abusive is determined by considering the totality of the circumstances. Courts look to the following factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically

threatening or humiliating as opposed to a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance, and (5) whether the conduct undermines the plaintiff's workplace competence. *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 325-26 (5th Cir. 2004), *citing Walker v. Thompson*, 214 F.3d 615, 625–26 (5th Cir.2000); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371 (1993).

Not all harassment will affect the terms, conditions, or privileges of employment. The mere utterance of an offensive comment or remark which hurts an employee's feelings is not sufficient to affect the conditions of employment. Simple teasing, offhand comments, and isolated incidents, unless they are extremely serious, are not sufficient to affect the terms, conditions or privileges of employment. *Kennedy*, 2014 WL 7366256 at *8, *citing Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986).

Plaintiff's harassment claim arises from her allegations that she was harassed because Acadian Ambulance did not adequately investigate her complaint that a co-worker attempted to poison her at the annual company crawfish boil, and her allegations that co-workers made jokes and/or comments about her, including the way she dressed, in the break room.

With respect to plaintiff's argument that the defendant failed to adequately

investigate the plaintiff's complaint of poisoning by another co-worker, the law is well-settled that failure to investigate a plaintiff's complaint is not an adverse employment action. In *Kuhn v. United Airlines*, 63 F. Supp. 3d 796, 802–03 (N.D. Ill. 2014), *aff'd sub nom. Kuhn v. United Airlines, Inc.*, 640 F. App'x 534 (7th Cir. 2016), the court held that failure to investigate a complaint of co-worker mistreatment does not rise to the level of an adverse employment action, to wit:

> Kuhn does not claim to have been subjected to the usual list of standard adverse employment actions—being fired or demoted, losing salary or benefits, or otherwise having her responsibilities decreased as a result of her 2007 EEOC charge or her February 2008 complaint. Instead, she claims that United failed to fully and impartially investigate her multiple complaints of co-worker mistreatment. The Seventh Circuit has not specifically addressed whether this qualifies as an adverse employment action. But the Second and Tenth Circuits have held that failure to investigate a complaint, where the protected activity at issue is the making of the same complaint, does not constitute an adverse action. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640–41 (10th Cir.2012); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2nd Cir.2010). This is because "a failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed." *Daniels*, 701 F.3d at 640; *Fincher*, 604 F.3d at 721 ("An employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint: Her situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint or had the complaint been investigated but denied for good reason or for none at all.").

This Court was unable to find any Fifth Circuit cases addressing the issue, but in the absence thereof, finds the *Daniels* and *Fincher* cases instructive. While it is

unclear if the cited jurisprudence applies to the type of complaint made by the plaintiff in this matter, the record is clear – and undisputed – that Acadian Ambulance did, in fact, investigate the plaintiff's complaint concerning the crawfish boil and was unable to find any evidence that a co-worker attempted to poison her. Acadiana Ambulance's argument on this point is uncontroverted by the plaintiff. Thus, the undersigned finds, as a matter of law, the failure of Acadian Ambulance to investigate the plaintiff's claim is not actionable. Furthermore, even if the undersigned were to find the claim were actionable, there are no genuine issues of material fact that Acadian Ambulance did, in fact, adequately investigate the claim and found nothing to substantiate it.

Additionally, Plaintiff's claims that co-workers made comments about her and the way she dressed does not rise to the level of actionable harassment. A hostile environment claim is not actionable unless the alleged discrimination is objectively unreasonable. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 443 (5th Cir. 2012), *citing Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011). A workplace environment is hostile when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently pervasive to alter the conditions of the victim's employment." *Dediol*, 655 F.3d at 441, *quoting Alaniz v. Zamora–Quezada*, 591 F.3d 761, 771 (5th Cir.2009). In assessing whether a claim meets that standard, courts

review "all of the relevant circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating or it is a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." *See, e.g., Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 269 (5th Cir.1998); *see also Dediol*, 655 F.3d at 441. "Incidental or occasional age-based comments, discourtesy, rudeness, or isolated incidents (unless extremely serious) are not discriminatory changes in the terms and conditions of a worker's employment." *Butler*, 161 F.3d at 269 n. 3.

In the instant case, the plaintiff testified:

A:    Knight would sit across from me and make comments about how I would dress. She'd talk about my clothes – and things. You know, I wear this jacket that I liked and she would talk about my jacket and talk about the way I wore my hair and my clothes.

Q:    Well, what kind of comments did she make?

A:    Like, "Check out that jacket." You know, it was a – it was a gray jacket and it had decorations on it on the sleeves and – and on the back. I can't remember the exact words, but she would talk about my jacket. And I liked – I liked that jacket. You know, I'd wear it all the time because it was  – it was a – it was kinda – it was big and it was comfortable, so I'd wear it when I was cold in the building.

Q:    So what do you mean by she would make comments?

A:    Yeah. She would make negative comments.

Q:    Do you remember anything that she said?

A:     Not right offhand no – no, not really.  Not right now, I can't remember anything, you know, specific comments.[6]

The plaintiff further testified:

A:     They wouldn't really talk to me and they would make all these little comments.

Q:     What kind of comments?

A:     I don't really know.  Like I said, some other stuff I had in my notes.   Some of it I – I put down, but I don't remember specifically, but they would make comments.[7]

The foregoing testimony shows the plaintiff's complaints of harassment are more akin to general complaints that co-workers were "talking" about her and her clothing.  Other than the fact that a co-worker stated "check out that jacket," the plaintiff has provided almost no detail regarding the nature and context of other comments made by her co-workers.  Furthermore, the plaintiff presents no evidence that the comments were physically threatening or humiliating, or that the comments interfered with her job performance.

Moreover, the plaintiff fails to present any evidence that she was subjected to a hostile work environment *because of her age*.  In support of her claim, the plaintiff testified:

---

[6] *See* plaintiff's deposition, attached as Exhibit A to defendant's motion for summary judgment, Doc. 35, at 92-93.

[7] *Id.* at 102-03.

Q:    You said that you were being harassed and teased about your age.
      What do you mean by that?

A:    I don't really know.  I don't remember what that was about but it
      was in that same group because they're really the only people that
      I was in contact with.  I don't know.

Q:    So you don't remember any specific things being said about your
      age?

A:    No.  There must have been something, but I don't remember what it was.

Q:    Now what about age discrimination claims.  Have you ever heard
      anybody make comments about an employee's age that you have
      heard?

A:    I'm not really sure.  Like I said, when I was  – I'm not really sure;
      I don't remember.  I'm going to have to think about that one
      because I know I said something in there about Martha making a
      comment, but I can't remember what it was.  Because, like I said,
      she's really the one that made the difference in age with us and
      the younger employees.

Q:    Did Martha ever say anything to you specifically about your age?
      Any comments about your age.

A:    Not that I can think of right now.

Q:    Now –

A:    I don't remember.

Q:    What about any other employees, if you ever heard Martha –

A:    I don't know.

Q:    – discuss anybody – make comments about anybody else based on their
      age?

A:     I – I  don't know . . .  So, I – I, like I said, I can't remember right now. I can't remember.

Q:     Did you ever hear Martha Dugas say anything about anybody's age? Make any age related comments about another employee?

A:     I – I don't know.  I don't remember.  Im gonna have to think about that.

Q:     And what about to you personally?

A:     Like I said, I can't remember.  I have to think – think about that one because I don't really remember.

Q:     But you don't remember anything specific said about age?

A:     No, not right now.[8]

The foregoing testimony shows that the plaintiff is unable to represent any evidence that she was harassed on the basis of her age.  Thus, on these facts, the undersigned finds the plaintiff presents no genuine issue of material fact that she was subjected to a hostile work environment or, specifically, that she was subjected to a hostile work environment based on her age.  Moreover, even if the plaintiff were able to show a hostile work environment, the record also shows that Acadian Ambulance twice moved the plaintiff's work station so as to ameliorate her working conditions, and the plaintiff admitted such action made her working conditions better. Considering the foregoing, IT IS RECOMMENDED that the plaintiff's hostile work

---

[8] *Id.* at 213-15.

environment claim be DENIED AND DISMISSED WITH PREJUDICE.

## V.  Conclusion

Based on the foregoing, IT IS RECOMMENDED that the Motion for Summary Judgment [Doc. 35] filed by defendant Acadian Ambulance Services, Inc. ("Acadian Ambulance") be GRANTED for the reasons stated herein.   Specifically, the undersigned finds the plaintiff fails to establish a *prima facie* case of age discrimination, and therefore, IT IS RECOMMENDED that the plaintiff's age discrimination claim be DENIED AND DISMISSED WITH PREJUDICE.  Similarly, the undersigned finds there are no genuine issues of material fact in dispute regarding the plaintiff's hostile work environment claim, and Acadian Ambulance is entitled to summary dismissal of this claim as a matter of law.   Therefore, IT IS RECOMMENDED that the plaintiff's hostile work environment claim be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.1996).

THUS DONE AND SIGNED this 5th day of December, 2017, at Lafayette, Louisiana.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE